**COLUMBUS PLASTIC PRODUCTS, Inc. v.
RONA PLASTIC CORP. et al.**

United States District Court,
S. D. New York.

April 22, 1953.

Burke & Burke, New York City (Mc-Dowell & Rambo and James M. Hengst, Columbus, Ohio, of counsel), for plaintiff.

H. C. Bierman, New York City, for defendants.

MURPHY, District Judge.

This is an action for unfair competition and infringement of design and mechanical patents arising out of defendants' alleged manufacture, sale and use of plastic kitchen canister sets virtually identical with plaintiff's prior product. The original complaint, grounded only on unfair competition, was filed March 15, 1951 and demanded temporary and permanent injunctions, accounting, punitive damages, destruction of defendants' molds, costs and attorneys' fees. The answer denied the unlawfulness of defendants' conduct and a cross-claim was made for libel and slander arising out of a circular letter by plaintiff warning customers of defendants' product as well as for punitive damages under the Sherman Act and attorneys' fees. A supplemental complaint filed April 12, 1951 alleged infringement of a design patent issued to plaintiff on March 20, 1951. On June 8, 1951, this court per Leibell, J. granted a temporary injunction (Civ. No. 65–28,[1] filed May 29, 1951) but refused on October 10, 1951 to allow contempt based upon alleged infringement of a second set of canisters manufactured and sold by defendants. After issuance to plaintiff of a mechanical patent on November 20, 1951, a second supplemental complaint was filed December 7, 1951 alleging its infringement. The issues before this court after trial without jury accordingly are: whether the temporary injunction relating to defendants' first allegedly infringing product should be made permanent; whether a permanent injunction should issue with respect to defendants' second product; defendants' cross-claim;

and other remedies demanded by both parties.

The court makes the following

Findings of Fact.

1. The plaintiff is a corporation organized under the laws of the State of Ohio, and defendant, Rona Plastic Corporation, is a New York corporation, with a place of doing business within this judicial district. Defendants, Louis Stahl, Yale J. Halperin, and Solomon Jack Stahl, are citizens of the State of New York and residents within this judicial district. The matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

2. Plaintiff is manufacturer of a set of four plastic kitchen canisters, rectangular in shape, with flat sides having rounded edges and tapering inward slightly from top to base. The color of the flat lid which has a round knob contrasts with the rest of the canister. The vertical legend "Flour", "Sugar", "Coffee" and "Tea", respectively, indicates the use for each canister which diminishes in size in that order. The canisters are made so that each smaller one may be "nested" or telescoped within a larger one.

3. Plaintiff's canisters were designed by an engineer employed by them since 1940. A design patent was issued to plaintiff (No. 162,579) on March 20, 1951 upon application of the designer made March 10, 1950, and a mechanical patent (No. 2,575,770) was issued November 20, 1951.

4. These canisters bear the name "Lustro-Ware" molded on the bottom.

5. Plaintiff's canisters were first displayed and sold to wholesalers and retailers in January, 1950. Between January, 1950 and February 28, 1951, plaintiff's sales of these canisters totalled $2,159,439. Plaintiff expended less than $26,000 in advertising these canisters during this period.

6. During this period canister sets by at least two manufacturers similar in appearance to plaintiff's were on the market.

7. During this period public acceptance of plaintiff's canisters was due to their use-

fulness and attractive appearance without regard to their source of manufacture.

8. In January, 1951, defendant Rona Plastic Corporation with which the individual defendants are associated, commenced manufacture and sale of sets of canisters virtually identical in contour, size and detail to those of plaintiff. The only difference between the two sets are the mark on the bottom and a stippled border on top of the lid of defendant Rona's set. These differences would not be distinguishable to the ordinary purchaser.

9. Some time in 1951, defendant Rona manufactured and sold a second set of canisters identical in all respects to its first set except that the knob on the lid was now rectangular in shape and on each side and corresponding portion of the lid, two sets of three decorative panels were embossed. As in the case of its first set, these differences would not be distinguishable to the ordinary purchaser. A design patent (No. 165,403) was procured by defendant Stahl for this set on December 11, 1951 upon application filed July 6, 1951.

10. In the four months following March 1, 1951, plaintiff's sales of its canisters decreased $538,685.86, as compared with the four previous months. Plaintiff's sales continued to fall off in succeeding months.

### Discussion.

The issues in a case such as this have been thus stated by Frank, C. J., in Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 194 F.2d 416, 418:

"The fact that the design of an article is strikingly novel and beautiful, and the fact that its first producer has spent large sums in advertising which has made the article popular with consumers, give that first producer no rights against others who subsequently imitate it and (taking advantage of the consumer-popularity of the article, due to the first producer's advertising) sell it competitively—unless the first producer has a monopoly based upon (1) a patent on the design or (2) a so-called secondary meaning. Absent (1) and (2), the first producer has no legal complaint because the imitators have

been enriched by his efforts, have enjoyed what is known as a 'free ride.'"

### I.

We consider first the matter of secondary meaning.

The nature of the remedy sought—permanent injunction for unfair competition—should be appraised at the outset. When a product of plaintiff's ingenuity, investment, time and effort has been slavishly imitated by defendant, several remedies under varying circumstances may be available. A design copyright might be obtained if the product could qualify under the copyright statute as, perhaps, "a work of art." 17 U.S.C.A. § 5(h, g); Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 23 S. Ct. 298, 47 L.Ed. 460; King Features Syndicate v. Fleischer, 2 Cir., 299 F. 533. To a large extent this would depend upon its non-utilitarian aspects. Cf. Stein v. Expert Lamp Co., 7 Cir., 188 F.2d 611, certiorari denied, 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627; Jack Adelman, Inc. v. Sonners & Gordon, Inc., D.C.S.D.N.Y., 112 F.Supp. 187. Under somewhat stringent requirements of inventiveness in this circuit, "any new, original and ornamental design for an article of manufacture", 35 U.S.C.A. § 171, might be protected by design patent. Cf. Briddell, Inc. v. Alglobe Trading Corp., supra, 194 F.2d 416, 419 note 3 (cases collected). But these remedies grant a monopoly of sharply limited duration, and then only upon the basis of a legislative appraisal of the conflicting interests involved which is specifically authorized by the Constitution. Art. I, § 8. What is sought here is monopoly eternal in duration and grounded only upon judicial appraisal of conflicting interests, without possibly any legislative resolution of them. Cf. Lanham Act, 15 U.S.C.A. § 1126(h, i); Dad's Root Beer Co. v. Doc's Beverages, 2 Cir., 193 F.2d 77, 79–82.

It is not surprising that protection so considerable requires surmounting several serious hurdles. Conceding the copying, identical appearance and competitive sale in the same market of defendant's product with plaintiff's, plaintiff must establish that (3 Restatement, Torts (1938) § 741):

"(b) the copied or imitated feature has acquired generally in the market a special significance identifying the other's goods, and

"(i) the copy or imitation is likely to cause prospective purchasers to regard his goods as those of the other, and

"(ii) the copied or imitated feature is non-functional, or, if it is functional, he does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the other."

The evidence is undisputed that plaintiff's canisters were put into commercial production in the latter part of 1949 and sold about January 1, 1950. Defendants entered the market with their copy in January, 1951. This latter date fixes the time at which plaintiff's product must have acquired the special significance requisite for its protection.

. Although plaintiff had been in business since 1938, had used the trade name "Lustro-Ware" in connection with its 115 products and had realized sales in excess of $6 million in 1951, its sales of the canisters in question from January, 1950 to the end of February, 1951 amounted to slightly more than one-third of this figure. Although plaintiff had spent about $100,000 in advertising all of its products in 1951 only slightly more than one-quarter of this sum was expended on its canisters. During 1950 at least two manufacturers had rectangular plastic canisters on the market, one of these as early as 1948.

To establish the existence of secondary meaning during this period, plaintiff called three housewives as witnesses. One, Mrs. Atlas, testified that defendants' canister sets were purchased without knowing of its manufacturer at the time. She "wanted a cookie jar to match it", saw "an ad in the paper about [plaintiff], about plastics", and "thought maybe if I wrote to the firm I would know of the place where I could buy it." She did not learn who manufactured her set until a lawyer for the plaintiff telephoned her. At the time of acquisition she neither cared who the manufacturer was nor had ever heard of plaintiff or defendants.

. Similar testimony was given by Mrs. Hughes. She too had purchased defendants' product and had written to plaintiff after seeing one of its advertisements because it "might know where I could purchase one of the lids" which had been lost. At the time of acquisition she also neither cared who manufactured the product nor had ever heard of plaintiff or defendant. "I think," she testified, "the first time I saw a set was the first time I bought one."

Mrs. Bird, after seeing an advertisement, wrote to two or three manufacturers, including plaintiff, and apparently received no replies. She recalled plaintiff only because one of its attorneys later telephoned her. As a Christmas present, she received defendants' set. Like the others, she neither knew nor cared who was the manufacturer.

The test of secondary meaning is of course "likelihood of confusion" and not actual confusion. But the confusion does not stem merely from similarity or even identity of the questioned product with that of the first comer; it must be a confusion of manufacture and relate to that which attaches to the personality of the manufacturer. The first maker of plastic canisters in this appealing style may have created public desire for one of two things: (1) plastic canisters made by him alone, above all other plastic canister makers; or (2) plastic canisters in a particular form regardless of who makes them. The sweeping monopoly granted by the law of unfair competition extends only to the first of these conditions. At most the testimony of these witnesses tends to establish only the second. In the oft-quoted words of Learned Hand, C. J., in Crescent Tool Co. v. Kilborn & Bishop Co., 2 Cir., 247 F. 299, 300:

"[I]t is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person—the plaintiff may not be individually known— makes them, and that the public cares

who does make them, and not merely for their appearance and structure."

One wholesale distributor and a salesman for plaintiff manufacturer's personal representative testified that they knew of palming off by distributors of defendants' wares for those of plaintiff. Such behavior is tortious and actionable. But the wholesale distributor—the plaintiff's witness and current jobber—named himself as the deceiver. The salesman—obviously interested in the outcome—knew of instances perpetrated by distributors in his presence. If such deception occurred, these distributors—including plaintiff's witness—may be enjoined, provided they are made parties in a proceeding. These witnesses are far from establishing the probability of confusion requisite for the perpetual decree sought against the manufacturing defendants.

A number of witnesses employed by plaintiff testified concerning the popularity, eye-appeal and "on the spot" acceptance of plaintiff's product. This was attributed by many of them to its so-called nonfunctional features. No fewer than nine of these were ascribed to the plastic container with rectangular sides tapering slightly inward from top to base: "flat surface square or cubical body"; "downwardly and inwardly tapering form"; "molded plastic composition"; "uniform coloration"; "rounded edges and corners at top, bottom and sides"; "vertical lettering on the front flat surface of the body"; "flat-top lids of colors contrasting with colors of body"; "wide diametered hollow knobs"; and "rounded corner edges."

It must be seriously doubted whether these are all "nonfunctional" characteristics. The line between what is superfluously decorative and what is usefully decorous must necessarily be shadowy for an attractive container. "When goods are bought largely for their aesthetic value, their features may be functional because they definitely contribute to that value and thus aid in the performance of an object for which the goods are intended. Thus, the shape of a bottle or other container may be functional though a different bottle or container may hold the goods equally well." Restatement, Torts (1938) § 742, Comment a.

Functional or not, these features have not been established by a preponderance of evidence as associating in the minds of its purchasers, plaintiff's product with plaintiff as its source. Accordingly the application for injunction based upon unfair competition must be denied.

## II.

A more limited monopoly is claimed by plaintiff by dint of a design patent (No. 162579) issued March 20, 1951 and a mechanical one (No. 2,575,770) granted November 20, 1951.

With respect to these, the recently enacted patent statute apparently applies. Section 4(a) of the Act July 19, 1952, c. 950, 66 Stat. 815, 35 U.S.C.A. preceding section 1, provides in part: "This Act shall take effect on January 1, 1953 * * *. It shall apply to unexpired patents granted prior to such date except as otherwise provided." The test for design patents remains substantially the same: "Whoever invents any new, original and ornamental design for an article of manufacture * * *," together with a statement assimilating requirements of patents for technological advances, "The provisions of this title relating to patents for inventions shall apply to patents for designs * * *." 35 U.S.C.A. § 171.

It is not clear that the ornamental nature of plaintiff's design possesses enough merit to meet the standards of novelty and originality. In A. C. Gilbert Co. v. Shemitz, 2 Cir., 45 F.2d 98, 99, the court per A. Hand, C. J., observed:

"If the design goes no farther than to embody an obvious neatness and attractiveness that will make articles of household use more compact and pleasing than has generally been the case, this is not in itself enough. The shape of a tin can might be thought to reach this degree of attractiveness, yet it would hardly be said to furnish a patentable design for a coffee pot. The subject of design patents is difficult, for there are no standards. Yet we are obliged to determine, as best we may, whether the design in question is original and aesthetic and involved a

step beyond the prior art requiring what it termed 'inventive genius.'"

In passing the contrast should be noted between the standards of artistic merit requisite for copyright and design patent. A plastic statuette of a typical cocker spaniel in ordinary pose known as "show position" has been upheld as valid for copyright. Contemporary Arts, Inc. v. F. W. Woolworth Co., D.C.Mass., 93 F.Supp. 739, affirmed 1 Cir., 193 F.2d 162, affirmed (certiorari on issue of damages only), 344 U.S. 228, 73 S.Ct. 222. On the other hand, the figure of a girl posed naturally as an ash tray ornamentation, has been held invalid as a patent design. Frankart, Inc. v. Apt Novelty Co., D.C.S.D.N.Y., 57 F.2d 757.

■ The question then of "inventive genius" becomes paramount. Evidence of prior art shows rectangular canisters with rounded corners, tapered sides and flat lid. Round, wide-diametered knobs are even more archaic. Plaintiff's step forward then consists of little more than the combination of the knob with the canister. As Judge McGohey observed in Grinoch v. Tuxton Cravats, Inc., D.C.S.D.N.Y., 101 F.Supp. 391, 392:

"Mere regrouping of elements old in the field will not suffice unless it rises 'above the commonplace' or demonstrates 'originality which is born of the inventive faculty'".

An "unstartling regrouping of old elements," Knickerbocker Plastic Co. v. Allied Molding Corp., 2 Cir., 184 F.2d 652, 654, is far from demonstrating "the same exceptional talent that is required for a mechanical patent." Nat Lewis Purses, Inc. v. Carole Bags, Inc., 2 Cir., 83 F.2d 475, 476. "[S]imple variants upon old themes, such as capable designers can turn out almost by permutation of old elements", are not proper subjects for patent protection. White v. Leanore Frocks, Inc., 2 Cir., 120 F.2d 113, 114. Indeed "more is required for a valid design patent than that the design be new and pleasing enough to catch the trade; it must be the product of 'invention,' by which is meant that conception of the design must demand some exceptional talent beyond the skill of the ordinary de-

signer." Neufeld-Furst & Co., Inc. v. Jay-Day Frocks, Inc., 2 Cir., 112 F.2d 715, 716.

■ The presumption of patentability sometimes said to arise from the issue of a patent, cf. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983, must in this case be viewed in the light of the grant of design patent to defendant Stahl for its second canister set which is quite indistinguishable from plaintiff's in appearance.

■ Accordingly, this design patent must be held invalid.

■ Under design patent the appearance of the article rather than its mechanical function receives protection, even where the design contributes to the performance of the mechanical function. See Gorham Mfg. Co. v. White, 14 Wall. 511, 524–525, 20 L.Ed. 731; In re La Montagne, 47 F.2d 975, 18 C.C.P.A., Patents, 1147. If the visual and mechanical aspects are inseparable, only one type of protection, either design or mechanical patent, is available. In re Barber, 81 F.2d 231, 23 C.C.P.A., Patents, 834.

[9] Plaintiff's mechanical patent is based on the "nesting" or telescoping aspect of its product by which packing and shipping are facilitated by having the larger canisters contain the smaller ones. The existence of prior art involving this "nesting" principle involving canisters as well as lids in such a manner as to prevent lateral displacement, has been established. Accordingly, the mechanical patent of plaintiff must be held invalid.

No evidence has been adduced by defendants in support of their cross-claim for damages in libel and under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, and accordingly, it must be dismissed.

Conclusions of Law.

1. This court has jurisdiction of the parties and the subject matter.

2. Plaintiff's design patent (No. 162,-579) is invalid.

3. Plaintiff's mechanical patent (No. 2,-575,770) is invalid.

4. Plaintiff's application for injunction based upon defendants' unfair competition is denied.

5. Plaintiff's application for injunction based upon defendants' infringement of its design and mechanical patents is denied.

6. Defendants' cross-claim for damages is dismissed.